The Honorable Judges of the United States Court of Appeals in and for the Seventh Judicial Circuit. Hear ye, hear ye, hear ye. All persons having business before this Honorable Court are admonished to draw near and give their attention as the Court is now sitting. God save the United States and this Honorable Court. Good morning all. Our first case this morning is Epic Systems versus Tata Consulting Services, Mr. Phillips. Good morning, Your Honors, and may it please the Court, as you say, my name is Carter Phillips and I represent TCS in this case. The only claim for damages by the plaintiffs in the proceedings below was for unjust enrichment. Wisconsin law is very clear that the way to determine unjust enrichment is by examining the benefit to the defendant that was conferred or that was obtained as a consequence of the behavior of the defendant, not the costs to the plaintiff in creating it and creating whatever was obtained in the first instance. This Court's decision in Lindquist-Ford, quoting the Wisconsin Supreme Court, says generally costs the plaintiff incurred are generally irrelevant. And they're not always irrelevant. There is a very narrow situation in which those costs candidly should be used. And that's the situation where essentially what's happened is that the defendant has simply stolen the ideas, the products, every feature, and then used them to compete directly against the plaintiff in a particular situation. And candidly, that was the assumption that Epic's expert operated on when he developed his model, which was the basis for the damages request and the only expert evidence on damages in this particular case. He took the entirety of the R&D costs that Epic incurred over a 10-year period, and then he manipulated them to a certain extent, depending on whether he could connect them up to a particular document. The only document, frankly, where we have any evidence that there was, in fact, use made by TCS of information that was obtained. That document is the comparative analysis between the MedMantra system and Epic's user web information. And the question, then, is what happened as it plays out? Well, it turns out that there is no evidence whatsoever in this record, it's undisputed, that none of the software in either MedMantra or in the DaVita product or in any other product appears to exist that has come from any of Epic's information. So there's no software, there's no source code that's conceded, that there was no source code taken. And so the question is, what is a sensible way to go about evaluating it? Typically what happens is an expert is told, work on a certain set of assumptions and develop a model of damages. And he did that. And then you find out that the model of damages doesn't fit the particular liability theory that's been proved at the case. What do you do then? You modify the model of damages. You start over. You look for other ways to try to figure out what's a reasonable way to value the benefit in the hands of TCS of what we know that TCS has done. Now, if all you're looking at, and it's at the end of the appendix of the blue brief, is that 14-page document, the comparative analysis, I defy you to come up with any rational basis by which that document in the hands of TCS has any value approaching $140 million. And to be clear, that's precisely what the jury was asked. The benefit of TCS's use of the comparative analysis, and the number $140 million, well, you don't need the software to create that comparative analysis. There's no evidence of the software being embedded in it. As Judge Conley recognized, that document could certainly be used in theory as a marketing piece, as a comparator. It could be used in an effort to try to negotiate with Epic to perhaps bring the two companies together in some kind of a joint enterprise to provide services to Kaiser. But what you can't do is come up with any basis on which that single document gets you to $140 million. And candidly, and I give the expert credit, I mean, he said point blank, the way I understood my task was I was to value what this cost to Epic, and if the plaintiffs could make any proof of any use of any information, then all of that value flowed directly to TCS. And the judge said that's not your call, and frankly, that's not the law, and he's dead right about that. And that's why that $140 million number is simply way too speculative, doesn't support the theory of the expert in this particular case has to be set aside. Now the district judge, I realize this is a cross-appeal, but the district judge also set aside the $100 million because that was for the use of other confidential information. He expressed very strong skepticism that there was actually any proof of any use of any other confidential information. And even if you can speculate as to some ways that this could have been used, is there some improvement to MedMontra, is there some improvement to DaVita, even if there's nothing in the software, is there something they learned about the U.S. market? None of that was testified to by their expert. Indeed, the expert didn't identify anything with respect to the $100 million. He simply said there was $200 million that was tied to the fact of some use. And there's no evidence that discusses that $100 million number. It is literally plucked by the jury out of the air and imposed on us, and the judge recognized it. And I want to be clear, I'm not apologizing, I am apologizing for what TCS did. It made mistakes. But we're not saying that you get a free pass when you make a mistake. They had a very aggressive injunction imposed against them for two years with very serious monitoring, and they could have put forth a theory of damages based on actual use, access to the information. They're in the business of providing access to information, and they licensed it under certain circumstances. That could have been a theory of damages in this case. Do you maintain that they're two different markets? They're undeniably two different markets. So they don't overlap, apparently. They don't overlap. At least that's your position. Right, that's our position. I mean, there is some evidence that the TCS had aspirations to get into the U.S. market, but the evidence became very clear that they abandoned those aspirations. So we are, in that sense, I suppose, very much ships passing in the night. Obviously, if you agree with me that either the $140 million or the $100 million are out, particularly the $140 million, then the punitive damages are out as well because they're tied, and they are required under—they have to be based on compensatory charges. Mr. Phillips, do you question the experts' estimate of the hours and the time spent on the research and development? We don't challenge that, Judge Flom. And part of the reason we never challenged it was I think we all along assumed at some point that Epic would tie in exactly which of those things were, in fact, used and that provided some form of benefit to TCS. He never did that, and so there was no reason to try to second-guess why you start off with a $3 billion number. What's clear to me is that the whole purpose of this exercise was to get a very, very large number in front of the jury, and then even by manipulating it down in the kind of classic experts' mumbo-jumbo way of manipulating the math, to go back to Judge Posner's and Judge Easterbrook's analysis of these things, it's pretty clear to me that at the end of the day, all he wanted was a very big number. There were much more reasonable numbers that could have been used. They chose not. We didn't say that they couldn't prove damages. We said that on this record, under these circumstances, they had not proved damages. As a consequence of that, the right answer in this case is zero. Were you also concerned about punitive damages? Well, if I'm right about the compensatories, then you don't have to worry about the punitive damages at all. And if I'm right about any aspect of sort of manipulating, you know, any—I mean, I think the right answer is zero, but even if you just were to send the case back for some other measure of compensatories, the damages would have to go under those circumstances as well because you can't just have punitive damages in the abstract. What would be the direction if we were to send it back on your theory of spills? What type of direction would you want this court to send? I think the right one is to say— Beyond our current jurisprudence. I think the right one to say is that you have to enter judgment now for the defendant because the plaintiff simply did not prove any actual benefit and there was no— At all. At all. There was no basis on which to—for the jury to make a finding of any number under these circumstances. That is precisely what our expert testified to. He didn't say that there weren't theories out there. He just said plaintiffs chose their theory. Their theory doesn't match up with the evidence in the case, and as a consequence, the right answer on this record is there is no evidence of any compensable injury. If the court has further questions, I'm happy to answer them, but I don't want to— Well, I only look at punitive damages. I thought you were obviously opposing that. I clearly am opposing that, and let me just say two things about punitive damages. It's obviously on the assumption that I haven't persuaded you on compensatory damages. There are two elements of it that I think the court should focus on. First of all, Wisconsin has what, at least from my perspective, is a strange rule, but nonetheless one that it's entitled to have, which says that you don't get punitive damages in an unjust enrichment type of a case. You have to have a situation where there is, in fact, actual injury to the plaintiff that gives rise to a compensatory award, and in that situation, it's tagged to punitive damages, and there is obviously no actual injury that was caused to Epic under these circumstances. As you say, they're not competitors. They lost no business. They still have all of the same confidential information. There's no injury been proved in this case. Second, if you don't accept that argument and you're just simply looking at the size of the punitive damage award, again, aside from just the notion of the ratio between compensatories and punitives, the court should step back and recognize that the magnitude, the size of the compensatory award in this case, $140 million, for essentially two businesses whose entire revenue stream during this period is about $3.5 million is so wildly out of whack with what you need in order to effectively deter behavior under these circumstances that the court exercising its de novo review would significantly reduce the punitive damage award. You simply do not need that number in order to deter this kind of conduct. Mr. Phillips, what, if anything, should we make of the district judge's statement that Epic narrowed its damages theory to TCS's use of confidential information detailed in Exhibit 39, the comparative analysis, by doing a comparative analysis of Epic's products against competing products developed by TCS? What's lacking there as far as specificity? So the problem is that all you've done is said, our baseline model is what did it cost to create the software? And then we just said, no, you have to pay for all that. And then they come back and they say, well, okay, judge, you didn't like that theory. Why? Because it's not connected. Going back through and saying that there are certain connections between information that's in UserWeb and within, that is the basis for the one-line entries, is still not a use of, you don't need software to do that. And there's no evidence of the use of software. We may have picked up the names of those sub-processes from UserWeb and put them in there. But the fair value of those entries is not at all, the cost of the software creation is not a fair proxy for the value of a series of entries on an outdated marketing document. And if you, I'm sorry, Your Honor. I interrupted you, I guess. But where did the jury come up with these big numbers? I saw somewhere there, I didn't, maybe it was something like $500 million or something that somebody brings in. So they look at the size and then took a percentage of that. Is there an error just starting with that? Because I don't understand. Well, yeah, there is. These big numbers. Yeah, the reason you get a big number is because the other side came in and said, look, we're going to take all of our development costs, which is a huge number. That's billions of dollars, and then we'll narrow it down to a lower time because they knew you weren't going to put $3.2 billion. You might have, actually, with this jury. You might have been able to get more than you did, but you shouldn't. And they recognized that, so they went in with $480 million, and that's the baseline. And again, that's the cost of some portion of the software creation that Epic undertook. The problem is the connection between that and what the benefit was to us. I mean, they had an expert who said, these are all numbers, and here are all the numbers. I mean, this is a classic situation where I believe an expert has simply led the jury down a primrose path. They followed him, and it's precisely the kind of situation where courts have to step in and say, no, no, no, no, this is gone. This is way, way beyond what would have been reasonable under the circumstances. Because originally the jury came out with $700 million. Yes, originally. And there's bigger numbers than I can imagine. So somehow or other, they had in front of them, which was perhaps the error, part of the error. It is part of the error. And candidly, if the focus had been much more on what I think it should have been, which was what is the real value of what uses have been proven, the numbers would have been significantly smaller. And candidly, I doubt very seriously that we would be here today. So is the bottom line, Mr. Phelps, that in a factual situation which we're confronted with here, there just is no way to create a baseline for any damages? No, no. Well, there's no way to do it now. No, I understand. But under these circumstances, could you? Of course. I mean, you could sit down and get an expert on marketing who could tell you that if you have the how you can use it and what value it would have to you and what you may have saved. And you could maybe even try to connect that to some of the other information that was obtained. You can always come in and say, look, what the effect of this was is that you got the benefit of access. You pay royalties for the benefit of access. They could have put any of those theories on. And, of course, they did get an injunction, and an important injunction. Because, candidly, a lot of the scare that they put to the jury was it's on the shelf. We're going to be afraid. We're going to live in fear, and you should take that into account. They just said, no, no, no, no, you can't take that into account, except for punitive. Could you ever use projected sales off of past performance? I'm just trying to get a handle on the range here that should have been or if needed to present to the jury. I mean, you'd have a different situation, obviously, if you made the classic theft. I just stole the product, started selling it. Then probably the measures of damage would both be what you lost in your profits, and you should also disgorge everything that you got by way of profits. The problem is there's no evidence. They didn't connect the dots to say how did it get used and what's the value of the use. Had they done that, it would have had a number. But that number would not have been $700 million. It wouldn't have been $480 million. It wouldn't have been $200 million. It wouldn't have been $140 million or $100 million. It would have been something in the kind of $2 million and $3 million range. All right. We've eaten into your rebuttal a little bit. I appreciate that. Thank you, Your Honor. Thank you, Mr. Phillips. Mr. Brody. Thank you, Judge, and may it please the Court. Let me start just by answering Judge Mannion, your question about the numbers. There was no $500 million number presented to the jury. The number that Mr. Britton testified to was $200 million, on which the jury awarded $140 million. The $700 million number that's mentioned is punitive damages. That was reduced by the trial court to $280 million pursuant to the Wisconsin statutory cap. So the numbers that we just heard aren't quite right. I'm just mentioning what the jury came up with initially. I'm not an advocate of that. I'm just saying that somehow or other somebody managed to document $700 million. They awarded $700 million in punitive damages. Correct. And that was reduced by the trial judge through the application of the Wisconsin statutory cap, something that we're not challenging. One thing that I think was lost in the argument we just heard is that we had a jury trial. We had a jury sworn to apply the law, to listen to the evidence, to make decisions, to follow the instructions, and they did that. And while TCS now wishes the result were different, what they've done today is really rehash the arguments they raised and failed in front of the jury. At trial, EPIC proved that TCS used EPIC's confidential information and trade secrets, that TCS benefited from that use in a number presented by several witnesses, not just the expert, and the trial court agreed. The jury so found and the trial court agreed. Judge Conley, in the post-trial motion, said that EPIC presented evidence from which a reasonable jury could infer its trade secrets and confidential information were used, and he identified the ways in which it was used to develop TCS's U.S. entry strategy. They were using this to develop an entry strategy, and DaVita, who presented evidence in their laboratory module, is how they did it. Judge Conley mentions DaVita. He also mentions that they used this information to discern dead ends to avoid and to prepare the comparative analysis and to improve their MedMounter product. So they used it. And we know they used it because the jury found that. The special interrogatory presented to the jury has a question on it asking, did they use the confidential information in an improper way, and the jury answered yes. An element of the tort claims was use. The jury found that the material was improperly used by TCS. That's a given, and it's not appealed. Based on credible evidence, the jury further found the value of that use. Mr. Martin testified as to the ways in which the information was valuable. Mr. Britton quantified it, and I will address that as I move on. So the jury verdict was correct, but it also cannot be challenged under the standard of review applicable to jury verdicts. TCS is essentially challenging a finding of fact. They're saying, well, maybe the damages were $1 million or $2 million or $5 million. That's a jury argument. They didn't make it below, and they can't make it here. So let's first talk about a use. Evidence of trial showed systematic use, showed that over 100,000 times TCS improperly accessed our confidential information. They took trade secret documents over 6,000 times. They took the programming guide for the central aspect of Epic's business. It's called Chronicles. It's the database that Epic's business runs off of. They downloaded the programming guide. Now, we're not seeking damages in the Part A analysis for that use. That's something separate. Our damages are very focused to what we could show they used. The evidence of trial showed that this was purposeful, that Mr. Reddy, the number two person in the Med Mantra organization, who in violation of all good practice also was involved in looking at the Kaiser business, put somebody from his team on the Kaiser business so he could know what's going on. No, this Kaiser business that you referred to, that was some sort of a mutual arrangement. Correct. These two companies had. Kaiser was a client of Epic's, and Kaiser needed TCS's computer services to make our system work. And we were nervous about that because TCS is a competitor, and we allowed them to do it on a written contract that prohibited them from doing exactly what they did here. They asked for permission to our user web information. We said no. They stole it anyway. So there was purposeful, systematic invasion of our trade secrets by TCS. Mr. Reddy sought out somebody who could compare the systems. He reached out to a man named Yala Pregada to do the analysis. We don't know much about Yala Pregada. He disappeared before trial. TCS says he doesn't work for them anymore, and they could not even give us an address for him. But we know what he did. He reached out to subject matter experts, SMEs. These are referred to in Exhibit 39, SME. And the M doesn't stand for marketing. Subject matter experts who came in and looked at Epic's software and compared it to what TCS did in MedMantra. And that produced Exhibit 39 and other documents. And it didn't end there. We showed that that information was used in presentations to the senior management of TCS to help them hone their U.S. entry strategy. Exhibit 159, presented to the jury, shows that they had identified key gaps in functional areas. That's exactly what the comparative analysis did. Key gaps in the functional areas to be addressed in moving MedMantra forward, and it would take 1,800 person months to do the work. Okay. What did they then do? They used it to hone their entry strategy for their laboratory module. That's DaVita. There's testimony on all of this. Okay. So they used it. It's not just a little, oh, we peaked. It was a stale marketing document. This was systematic use, sanctioned from the top down. Well, did they make the entry, so to speak? Pardon me? Yes, they did change their entry strategy. Well, I mean, an entry strategy, I guess, is how you get into another market. And I just wonder, did they get into the other market? They sold their laboratory module to DaVita, which is a U.S. Denver-based business. We probably caught them before they did everything they wanted to do. But, yes, they did use this. As Judge Connolly said, they used it to develop a laboratory module for their principal U.S. health care customer, DaVita. Okay. Now, we wish we had more evidence of this. We wish we could connect the dots between what we proved they did and what use they made of it. The difficulty in connecting the dots is that while we were out there doing our business, TCS was erasing the lines between all the dots. They engaged in, as found by the trial court, systematic efforts to conceal what had happened here. So, for example, could we determine who used UserWeb? Well, we know Mr. Ghajiram, there's testimony about this, shared his credentials for the asking, but we don't know with whom. Okay. Could we look at the computer records to show who used Ghajiram's credentials to access the information? That was destroyed. Those proxy logs were destroyed. Well, testimony showed that most of the illegal entry was done by violating the procedures in the clean room. They were supposed to keep these two businesses separate, and they didn't. So we looked for the two computers in the clean room that they used to violate the procedures. There were hard drives on those computers. Oops, they were destroyed. The evidence was not preserved. This is what TCS does for their living. They are a global computer consulting business. They allowed the critical evidence to be destroyed. Well, can we look at what the Med Mantra people did with the information they took? To do that, you'd have to just go look at what the Med Mantra people did. None of the Med Mantra computers were forensically imaged. Nothing was saved. Now, should TCS have known when their insider, Mr. Guyenet, sent a whistleblower report to the management of TCS that this improper thing was going on and they were using our information to improve Med Mantra, which he had seen with his very eyes? Should TCS have preserved the Med Mantra documents? Absolutely. And based on their failure to do that and their systematic destruction of evidence, the court allowed the jury to draw an adverse inference from the fact that evidence that should be there was missing. And frankly, it's rather bold for TCS to accuse Epic of failing to prove aspects of its case when our ability to prove our case was systematically hampered by their actions. Okay, so having proven use, having proven the destruction of documents that would have allowed greater proof, did we prove actual benefit? The answer is yes. There was testimony from Sterling Martin and from expert Brickman, and it demonstrated the following. Epic based its claim on its R&D costs. Now, the suggestion is we just put a big number in front of the jury. Not at all. The evidence is that over its time in business, Epic has spent $3.5 billion on developing the secrets and software that were accessed here. We did not claim $3.5 billion. Our claim was for $200 million. That's less than 6% of the total cost that the suggestion is we claim. Well, how did we get from $3.5 billion to $200 million? Well, first we excluded all development costs before 2005. Why? Because it didn't have any impact on the things they stole? No. We excluded it because our accounting system was upgraded in 2005. That beginning in that date allowed the cost of development to be linked specifically to the product of development. Before 2005, it would have just been an estimate. So we excluded the pre-2005 R&D. What next did we do? Then we limited it to the development costs that went into the things that were taken and used. And this comes mostly from the testimony of Sterling Martin. It's not just based on an expert. Mr. Martin reviewed the 6,000 documents that we could prove they took, and there are more that we couldn't prove, and identified every module in our system to which those documents related, and identified the modules in our system where what they took provided a substantial amount of the basis, the trade secret know-how for that module. That limited the claim from the post-2005 R&D down to a smaller number. Then Mr. Brickfin identified the costs from the cost accounting system, identified with those specific elements, and then he applied further deductions. He deducted the cost of software coding because while they stole some documents, they didn't steal the source code. He applied a deduction for depreciation. It was called half-life in the testimony. And through those approaches, he took this $3.5 billion number down to $2.5 billion to $480 million to $306 million to what was presented to the jury, which was $200 million. And he testified that that information anchored the benefit to TCS to what they took. And Judge Conley agreed. So this is not a situation where we have an expert running amok. We have a focused analysis tied to the extent we could to what we could still show they took after they got done destroying documents. Now, TCS suggests, oh, it's just a marketing document. And here they present alternate theories as to how the jury could have come up with a different number. Many of those arguments would be great arguments presented to a jury. If they wanted to argue to a jury that $200 million wasn't the right number, that the only value they took was a marketing value and that was $5 million, they could have presented evidence. There wasn't. And factually, the trial court, first, factually they stipulated that the comparative analysis wasn't based on publicly available information. They stipulated it was based on our confidence. The trial court granted a motion in limine that prohibited them from arguing the comparative analysis  And based on their failure to adduce proof, they made a strategic choice. They presented the jury with a binary choice. Epic argued for $200 million. They said, well, maybe you ought to deduct 30% because the costs in India are less, but they presented no other damage figure. They didn't present a damage witness to say the numbers are less. They made a strategic choice. And the jury, after hearing all of the evidence, which I've just scratched the surface on, decided that Epic had proved its case and awarded the number that was left before them. It was supported by substantial evidence, and Judge Conley found the same. Now, they suggest that counterfactually, if TCS didn't steal this information and behave differently, maybe the measure of damage should be what it would have cost them to develop this some other way. In other words, had they had to pay for what they took rather than take it, what would they have paid for it? Well, we submit that's not supported by the law. Second, we submit that provides a really perverse incentive. And third, it's a jury argument. The jury here rejected it. Let me turn to the legal issue on damages, because I think a couple of things were skipped in TCS's presentation. First, the jury instruction in this case presented the theory of development costs. The jury was instructed they could award development costs, and that's not appealed. And in their appeal brief, TCS acknowledges, as Wisconsin law supports, that development costs, our development costs, can be a proxy for the benefit of the defendant. And that's, as I said, amply supported by the law. The Ludhian case talks about the damages that apply for wrongfully obtained benefit. The Propack case of this court explains that value to the defendant and value to the plaintiff overlap. They're kind of two sides of the same coin. And that's the reason why the court allows this proxy measure. The restatement supports that view. And counsel relies on the Lindquist case. The Lindquist case is an interesting case. It's from this court. It's not a Wisconsin court. It's interpreting Wisconsin law. And the holding in the case, the ruling of the court, is that it was error for the trial court to exclude certain evidence about the contract the parties had negotiated and failed to reach. The discussion about damages is dicta. And the language that counsel relies on about cost really has nothing to do with the issue in that case or, frankly, the issue in our case. In Lindquist, the damages that were awarded were not based on the plaintiff's cost. They were awarded in a different measure. It was an assumption of what someone in that industry would be paid. So it really has nothing to do with our case. The holding in Lindquist that comes closest is the discussion that you should look to the benefit to the defendant. And with that, we agree. We suggest, though, the law allows development costs as a proxy. Let me turn to punitives, and then I have one other point. On punitives, Wisconsin law permits punitive damages to be awarded when the jury awards compensatory damages. That's what the Groscheck case says, and that's what happened here. The jury awarded compensatory damages. If you look at the jury verdict form, there's a line for compensatory damages, and it says $140 million. And under Wisconsin law, damages of this type are allowed to be compensatory damages. To hold otherwise would violate Wisconsin law. The more serious argument I think they raise is this due process excessiveness argument. And the more I thought about that, it occurred to me that what the trial court upheld here was treble damages. The jury found actual compensatory damages of $140 million, and the trial court, after applying the Wisconsin cap, allowed that to be trebled. The suggestion that awarding treble damages violates due process would come as a surprise to most antitrust litigators, and it would come as a surprise to all those courts across the country that have upheld antitrust verdicts with exemplary damages much larger than the punitive damages allowed in this case. So no, the law is that punitive damages in a single-digit ratio like we have here do not violate the Constitution. That's what the Campbell case said. The other argument they make is that maybe we need to remand because of the Part A, Part B problem. We addressed that in the briefs. The conduct for both cases is the same. And let me end with what I think is underlying many of the arguments in this case, and it's kind of the elephant in the room. The damages here are very large.  If TCS has a complaint about that, they ought to look in the mirror because they engaged in a systematic theft of our trade secrets and a systematic destruction of documents. But the damages are large for a reason. Epic's business is a multi-billion-dollar business. TCS's business is a multi-billion-dollar business. Their profits in the year before the verdict were $3.5 billion. Now, I'm not saying they should be punished because they're large. No, absolutely not. The jury applied the law. The jury was properly instructed, and the trial court applied the law on the post-trial motions. But the fact that the verdict is large and the amounts are large here is just a consequence of what TCS did. Thank you. Thank you, Spiro. Mr. Phillips. Thank you, Your Honors. I'll attempt to be brief. I think I'd like to cut to the chase here in terms of simplifying this case. What was the jury asked to base its damages on? It says you can look at TCS's benefits. This is Supplemental Appendix of 40. And in doing that, you can include the development costs saved by the misappropriation of Epic's trade secrets or confidential information if those were, in fact, actually used by TCS. Now, broad statements that they may have been used by TCS doesn't get you there. It certainly doesn't get you to the kinds of numbers we're talking about here. Let's look at the specific. $140 million. What's the interrogatory? Benefit of TCS's use of the comparative analysis. My friend speaks a lot about the comparative analysis, but he did not deny that there is no evidence that anywhere in there is there any software that's been used or that's been embedded in that. That's not to say it couldn't have been found. It's just to say that it isn't. And when he talked about the other uses, and he's talking about the DaVita and others, none of that has anything to do with the comparative analysis. That could only be relevant, frankly, to the $100 million, which the district judge himself set aside. He tries to say, well, but don't worry about all of that, because what ultimately happened is we didn't have access to the information that would allow us to know whether or not this was used for MedMontra or was used for DaVita. And again, this is the record 619. The testimony is absolutely clear. TCS made its source code available for inspection by Epic. Epic chose not to look at it. TCS produced the entire contents of its two version control systems, which reflected the entire development history for MedMontra and DaVita Lab products, and they chose not to do anything with that. They just simply threw up their hands and said, we're going to go with the basic theory that was what their expert said. I'm entitled to identify all of the R&D monies that were, quote, saved, and if I can find any use whatsoever, and that document, that comparative analysis, a use, then we get all of those damages, and that's how you end up with a number. And I'll end with a comment about the expert. To be sure, he brought the number down from an absolutely ridiculous $4.3 billion to a just barely less ridiculous $200 million. That still bears no relationship to what happened or to any kind of a benefit that my client obtained in this case. Being a $12 billion operation, it's not a justification for just hitting him with a large compensatory award, and certainly not a punitive award in this case. Thank you, Mr. Phillips. Thank you, Mr. Brody. And thanks to all counsel. The case is taken under advisement.